## Case No. 16,012.

UNITED STATES v. The PAUL SHEARMAN.

[Pet. C. C. 98.] 1

Circuit Court, D. New Jersey. April Term, 1815.

NON-INTERCOURSE LAWS—FORFEITURE OF INSURANCE—PROOF OF POLICY—ADMISSION OF COPY —PRESUMPTIONS—BURDEN OF PROOF.

1. Condemnation of a vessel and cargo, under the act of congress prohibiting intercourse with Great Britain, &c. 4 Laws [Bior. & D.] 211 [2 Stat. 550].

2. A copy of a policy of insurance, proved to have been compared with the original register on the books of the insurance company, and notice given to produce the original, cannot be read in evidence. The register, in the hands of the company, should be exhibited, after proving the existence of the original policy.

3. Where a prohibited cargo was taken in at a port with which intercourse is prohibited by law, and brought into a port of the United States, it is to be presumed, that the cargo was laden with an intention to import the same in-

1 [Reported by Richard Peters, Jr., Esq.]

to the United States; but this presumption may be repelled by evidence.

4. The burthen of proof, is placed on the claimant of property taken in delicto.

5. Liberty in a policy of insurance to touch at a place, does not justify trading, and trading would be a deviation, and avoid the policy.

[Appeal from the district court of the United States for the district of New Jersey.]

This was a libel filed in the district court of New Jersey, on behalf of the United States, against this vessel and her cargo, for a breach of the non-intercourse law. The libel charges, that the cargo, being the produce of the Island of Jamaica, a British dependency, was, some time in June, 1811, taken on board at that island, with the knowledge of the master, with the intention of importing it into the United States; and that the same was in fact imported into the port of Perth Amboy, contrary to the act, "to interdict the commercial intercourse between the United States and Great Britain and France, and for other purposes." To this libel, an answer was put in by Peter M'Kinley, who claims the vessel and her cargo; stating that this cargo was sent on board, with intention to be carried to the Havanna, to be there disposed of, and the proceeds to be invested in the produce of the Island of Cuba, to be imported into the United States. But that the vessel was refused an entry at Havanna, on account of her having on board three Frenchmen, who, together with fourteen others, and about 10,000 dollars in specie, had been saved from a wreck on the coast of Cuba, by the captain of this vessel, whilst on her voyage to Havanna. That in consequence of this refusal, and the want of provisions and water for this increased number of persons on board, the captain had entered the waters of the United States, in order to land the persons so taken from the wreck, to obtain provisions and water, and to receive instructions for the further destination of the brig and cargo. The district court dismissed the libel [case unreported], from which sentence this appeal was taken.

It appeared in evidence, that this vessel arrived at Amboy on the 15th of July, 1811. On the next day, the captain delivered, to an officer of the customs, a manifest of the cargo, stating the voyage to have been from Havanna to Amboy. The second report and manifest, with the usual affidavit subjoined, was delivered to the collector of that port on the 23d July; in which the voyage is stated to have been from Jamaica to Amboy, by the way of Havanna; the cargo (except one puncheon of rum, belonging to the captain) being consigned to the claimant at New York. On the 17th July, before any attempt to break bulk, or to land the cargo, the collector made the seizure; and, on the same, or the next day, the captain made his protest. The clearance at Jamaica, was for

the Havanna. The facts stated in the claim, were fully supported by the testimony of the master and of the supercargo. A policy of insurance, made at New York, dated the 11th July, 1811, on this vessel, on a voyage from Jamaica to the United States, with leave to touch at the Havanna, to return half a per cent. in case this privilege should not be used; was given in evidence by the claimant. The appellant offered in evidence, a copy of a copy of a policy of insurance on the cargo of the vessel, taken from the books of the insurance company at New York, and proved, by the deposition of a witness, to have been compared by him with the written parts of the said policy on said books, and to be a true copy. Notice to produce the original, was proved to have been given. To this evidence it was objected, that this is only a copy of a copy, and there is no evidence that an original policy had ever been executed, which ought to be proved. Peak, Ev. 96, 97.

WASHINGTON. Circuit Justice. This evidence is inadmissible, for both the reasons mentioned. To introduce a copy of an instrument, or to give evidence of its contents, the party should lay a foundation, by some evidence tending to prove that there was a genuine instrument in existence. The register of policies of insurance, kept by the insurance company, is nothing more than a private memorandum, which ought to have been produced, after proving the existence of an original.

Mr. M'Ilvain, and Mr. Stockton, for the United States, contended:

First. That the intention, when the cargo was taken on board at Jamaica, was to bring it into the United States; the calling at the Havanna, was a mere pretence to cover the real destination. That the captain, being the shipper and consignee of one puncheon of rum, part of the cargo; and being answerable to the owners for his conduct, is an incompetent witness; although that puncheon of rum is omitted in this libel. This ground will condemn the vessel, as well as the cargo, as it is admitted, that the cargo was taken on board with the knowledge of the master. As to the incompetency of the master, they cited Reeve, Shipp. 262. Second. That the cargo must be condemned upon the ground of an illegal importation, the necessity set up to justify it, being clearly unsupported.

Messrs. Williamson and Ogden, for the claimant, contended, as to the first point, that the onus probandi lies upon the United States, to prove the criminal intention alleged, as cause of forfeiture. But the evidence is all the other way. The evidence of the master and supercargo are uncontradicted, and proves the destination to have been for the Havanna. As to the second point; there was no importation at the time of the seizure; and, if so, nothing done afterwards by the claimant, could furnish a ground of forfeiture. There can be no importation, unless there was an intention to import, manifested by breaking of bulk, landing, or attempting to land, part of the cargo. In this case, the vessel was forced in by necessity; and the seizure was made, before any evidence of an intention to import was given. The first section of the non-intercourse law, prohibits armed vessels from coming within the waters of the United States; but, as to merchant vessels, the 4th, 5th and 6th sections speak of importation, and not of a mere coming into the waters of the United States. The 7th section shows, that a vessel having prohibited goods, and goods not prohibited; may come in and land the latter, without incurring a forfeiture of the former. Cases cited to show what amounts to an importation: 2 Wils. 257; Reeve, Shipp. 203, 206, 207; Harg. Law Tracts, 216; Coll. Jurid. 80.

WASHINGTON, Circuit Justice. It is contended for the claimant, that the United States, to effect the confiscation of this vessel and cargo, must make out a clear case of forfeiture; by proving that the cargo was taken in at Jamaica, with intention to import the same into the United States; or, that it was taken in, with the knowledge of the master, and was actually imported into the United States. The United States have proved, that the cargo, the produce and manufactory of a dependency of Great Britain, was taken in at Jamaica, and afterwards brought within the waters, and to a port of the United States. That the cargo was taken on board, with intention to import it into the United States, with the knowledge of the master, is a presumption arising out of the acts which are proved; because a man is always presumed to have intended to do, what he has actually done. But this presumption may be repelled by evidence on the other side, tending to show a different intention. Nothing is to be presumed in favour of a claimant in such case as this. His property is taken in delicto; and the burthen of proof is placed upon him, to explain his conduct, and to show the transaction to be innocent. It is always in his power, if he has acted bona fide, to exculpate himself from the charge to which appearances have exposed him; and, if he fail to do so, he must take the consequence of those acts, which, unexplained, amount to a breach of the law.

Let us see how the claimant in this case, has explained this transaction, and by what proof. He says, that his captain took in this cargo at Montego Bay, with an intention to carry it to Havanna, and there to dispose of it; and to invest the proceeds in sugar, to be transported to the United States. In proof of this intention, he shows the clearance from Montego Bay to the Havanna, and also produces the evidence of the captain and supercargo, to prove that such was the real des-

tination of the vessel. The clearance, though a necessary paper to be produced by the claimant, amounts to very little in the scale of evidence; where a different voyage has in fact been performed, and the reality of the ostensible destination, is subject to suspicion. If the real destination of this vessel had been to the United States, it is not to be supposed, that it would have been disclosed in one of the ship's papers; but a fictitious destination would of course have been avowed. As to the captain's testimony, I lay it entirely out of the case; not only on account of the strong motives he must have felt, to prevent the forfeiture of the vessel and cargo; but on account of his uncandid conduct after his arrival at Amboy. To use the least harsh epithet in respect to him, he was guilty of a palpable equivocation in his oath, verifying his second manifest; and it is most apparent, that his first report was untrue, and was designed to mislead the officers of the government, and to induce a belief that his voyage had been from the Havanna, and was of course a lawful one. I cannot, therefore, believe this man. It is sufficient to destroy his credit with me, to prove him guilty of a suppressio veri, and of unfair conduct, in relation to this particular transaction.

The evidence of the supercargo is not impeached, and it would therefore go a great way towards supporting the case of the claimant, if it were otherwise free from suspicion. But the trade, stated by this witness to have been intended, is altogether of so extraordinary a nature, that something more than his testimony is necessary to obtain credit for it. West India produce and manufactures, are carried by a vessel of the United States, from one West India island to be sold in another; where the same articles are produced and manufactured for exportation. There might be circumstances which would justify such a trade; but their existence should be proved, in order to remove the improbability, which the general nature of such trade stamps upon the transaction. It will not be sufficient for claimant to suppose circumstances, which might render such an intercourse probable; and from thence to argue that they existed in this case. It is said, that the claimant may have had funds in Jamaica, produced by the sale of the outward cargo of this vessel, or of the cargoes of former voyages; and that it might have been his interest to invest those funds in the produce of that island, and to dispose of them again, though at a loss, in the Havanna. But where is the evidence on which to found this supposition? If it be real, it was in the power of the claimant to show it. Where are his letters to his correspondent in Jamaica, and particularly, his letter of instructions to his captain and supercargo? It is not also to be supposed, that he left these agents to act and to carry on such a trade, with his funds, as they or either of them pleased. And even if this had been the case, some authority for doing so,

either written or verbal, would have been given, and might have been proved. It is said, that the claimant is an illiterate and irregular merchant, and probably kept no copies of his letters. But this assertion, so improbable in itself, is but an assertion, gratuitously made; and if well founded, was also susceptible of proof. Whilst speaking of the absence of the papers, and of evidence to clear away the strong presumption, which exists against the legality and fairness of this transaction; it may not be amiss to remark, that no bill of lading or invoice of this cargo, appears to have been produced in the district court, or has been produced in this court. These are the regular ship's papers, the absence of which ought to be accounted for. But this case is attended by circumstances, which scarcely leave a doubt as to the original and real destination of this vessel. In the first place, it appears by the report and manifest delivered to the collector on the 23d of July, that the cargo except one puncheon of rum, came consigned to the claimant, the owner of the vessel, on whose account it was purchased. This, in the absence of the usual ship's papers, before noticed, affords strong presumptive proof, that the real destination of this vessel, was to some port of the United States, where the consignee lived. In the next place, it appears that the vessel was insured, by the owner, from Jamaica to New York, with liberty merely to touch at Havanna. If the object of the voyage was, as has been supposed, to withdraw funds from Jamaica, and to invest them in the produce of the Island of Cuba; is it conceivable, that the claimant would pay a premium for an indemnity, which the contemplated act would forfeit? For the liberty to touch at Havanna, would not have justified a trading there; and the act of trading, would have amounted to a deviation, and have avoided the policy. Besides, the agreement to return a part of the premium, in case even the slight privilege of touching at the Havanna should not be used, taken in connection with the voyage insured, is conclusive to show, that the real destination was from Jamaica to the United States. Such was the voyage intended, and such was the voyage performed. It is said, however, that she came into Amboy for the purpose of landing the persons taken from the wreck, and to receive the orders of the owner. But, was any such intention even pretended by the captain or supercargo, until the lapse of two or three days; when it seems to have been thought prudent to draw up a protest? So far from it, that the first report delivered by the master to an officer of the customs, falsely stated a legal voyage from Havanna to Amboy; although the master has sworn in his deposition, that he did not even drop his anchor at that port. This circumstance alone, is sufficient to destroy the plea of ignorance in the captain, set up to excuse this statement. In short, I feel myself constrained to say of this case, that the illegality of the

transaction, is attempted to be concealed by a drapery, too thin to impose upon the most credulous mind. The sentence below must be reversed, with costs, and the vessel and cargo condemned.